UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#:
DATE FILED: 3/26/19

KEYBANK NATIONAL ASSOCIATION,

Plaintiff,

v.

FRANKLIN ADVISERS, INC., ET AL.,

Defendants.

No. 18-CV-3755 (RA)

FIFTH THIRD BANK,

Plaintiff,

v.

FRANKLIN ADVISERS, INC., ET AL.,

Defendants.

OPINION & ORDER

No. 18-CV-3762 (RA)

RONNIE ABRAMS, United States District Judge:

These cases concern a contractual dispute among creditors that provided financing to a bankrupt Chapter 11 debtor so that the debtor could continue operating during its reorganization. Plaintiffs KeyBank National Association and Fifth Third Bank initially brought this action in the Supreme Court for the State of New York, New York County, asserting state law claims for breach of contract, breach of the covenant of good faith and fair dealing, tortious interference with contract, and a declaratory judgment against Defendant Franklin Advisers, Inc. and seven mutual funds (collectively, "Defendants").[1] In short, Plaintiffs allege that Defendants' decision to enter

---

[1] Defendant Franklin Advisers, Inc. manages the other seven Defendant mutual funds, which include Franklin Investors Securities Trust – Franklin Floating Rate Daily Access Fund; Franklin Floating Rate Master Trust – Franklin Floating Rate Master Series; Franklin Templeton Series II Funds – Franklin Floating Rate II Fund; Kansas Public Employees Retirement System; Franklin Floating Rate Master Trust – Franklin Lower Tier Floating Rate Fund;

1

into a financing agreement with the Chapter 11 debtor, in which Plaintiffs declined to partake, violated the terms of an earlier financing agreement between Plaintiffs, Defendants, the debtor, and related parties. After Plaintiffs filed their Complaints, Defendants timely removed these actions to this Court, pursuant to the bankruptcy removal statute, 28 U.S.C. § 1452. Now before the Court is a threshold dispute over where these cases should proceed: Plaintiffs seek to have these actions remanded to New York State Court, while Defendants seek to have them transferred to the United States District Court for the District of Delaware. For the reasons that follow, these cases will be consolidated and both parties' motions denied, such that this case will proceed in this Court, where it will be referred to the Bankruptcy Court for the Southern District of New York, pursuant to the Amended Standing Order of Reference Re: Title 11 (S.D.N.Y. Jan. 31, 2012).

## FACTUAL BACKGROUND[2]

In June 2013, Appvion Inc. and certain of its affiliates (together, "Appvion") entered into a credit agreement with several lenders (the "pre-petition credit agreement"), including Plaintiffs and seven of the eight Defendants in these cases, among others (the "pre-petition lenders").[3] A few years later, on October 1, 2017 (the "Petition Date"), Appvion filed petitions to commence reorganization under 11 U.S.C. §§ 101 *et seq.*, in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"). *See In re Appvion, Inc.*, No. 17-12082 (Bankr. D.

---

Franklin Floating Rate Master Trust – Franklin Middle Tier floating Rate Fund; and Franklin Templeton Series II Funds – Franklin Upper Tier Floating Rate Fund.

[2] The facts in this section are taken from Plaintiffs' Complaints and accompanying exhibits, and they are assumed to be true for purposes of these motions. *See Weiss v. Hager*, No. 11 Civ. 2740 (VB), 2011 WL 6425542, at *2 (S.D.N.Y. Dec. 19, 2011) (accepting allegations in complaint as true when considering motion to remand); *Tlapanco v. Elges*, 207 F. Supp. 3d 324, 326 n.2 (S.D.N.Y. 2016) (accepting allegations in complaint as true when considering motion to transfer). They are also drawn from Defendants' notices of removal and the factual submissions in the parties' briefing, which this Court may consider in deciding the motion to remand, *see Marc J. Bern & Partners LLP v. U.S. Legal Support, Inc.*, No. 17 Civ. 6771 (ER), 2018 WL 2943784, at *1 n.1 (S.D.N.Y. June 11, 2018), and the motion to transfer, *see Everlast World's Boxing Headquarters Corp. v. Ringside, Inc.*, 928 F. Supp. 2d 735, 735 n.1 (S.D.N.Y. 2013). The Court also takes judicial notice of the record in the underlying bankruptcy proceedings. *See Argosy Capital Group III, L.P. v. Triangle Capital Corp.*, No. 17 Civ. 9845 (ER), 2019 WL 140730, *1 n.1 (S.D.N.Y. Jan. 9, 2019).

[3] Defendant Franklin Advisers, Inc. was not a pre-petition lender.

Del.) ("*In re Appvion*"). As a result, Appvion became a debtor in possession ("DIP").[4] At that time, $253.3 million remained outstanding under the pre-petition credit agreement.

Like many Chapter 11 debtors-in-possession, Appvion needed further credit to complete its reorganization. To that end, on October 2, 2017, Appvion sought the Bankruptcy Court's permission to obtain post-petition financing through a proposed debtor-in-possession credit agreement (the "Original DIP Agreement") with certain of the pre-petition lenders, including Plaintiffs and six of the Defendants.[5] *See* 11 U.S.C. § 364 (authorizing debtors-in-possession to obtain, after notice and a hearing, certain post-petition financing from lenders, in exchange for providing lenders with various security enhancements, such as priority claims to, and liens on, the DIP collateral); Fed. Bank. R. 4001(c) (setting forth the procedural requirements for requests to obtain post-petition credit under 11 U.S.C. § 364). The Original DIP Agreement was intended to replace the pre-petition credit agreement.

## A. The Original DIP Agreement

Fundamentally, the Original DIP Agreement proposed to (1) convert approximately $240 million of outstanding loans under the pre-petition credit agreement into post-petition loans, which is commonly referred to in bankruptcy as a "roll-up" (the "Original Roll-Up Loans"); and (2) to provide Appvion with $85 million of new financing (the "Original New Money Loans") (together, the "DIP Loans"). Plaintiffs did not participate in the financing of the Original New Money Loans. In exchange for providing the DIP Loans, the loans would be given, among other things,

---

[4] A "debtor-in-possession" refers to a Chapter 11 debtor that "continues to operate its business as a fiduciary to the bankruptcy estate." Black's Law Dictionary (10th ed. 2014); *see also In re Bayou Grp., L.L.C.*, 363 B.R. 674, 686 (S.D.N.Y. 2007) ("[An] entity that files in Chapter 11 is automatically authorized to act as the debtor-in-possession[.]") (citing 11 U.S.C. § 1101(1)), *aff'd sub nom. In re Bayou Grp., LLC*, 564 F.3d 541 (2d Cir. 2009).

[5] The two Defendants that were not parties to the Original DIP Agreement are Defendant Franklin Advisers Inc., and Defendant Franklin Templeton Series II Funds – Franklin Upper Tier Floating Rate Fund. Nor were these Defendants parties to the Amended DIP Agreement discussed further herein. The Court, however, uses the term "Defendants" generally to refer to the six Defendants that are parties to the DIP Agreements as well as the eight named Defendants.

"superpriority" status and senior security liens on all of the DIP Collateral. *See* 11 U.S.C. § 364(c) (providing that these protections are available to creditors who provide post-petition financing).[6]

On October 3, 2017, the Bankruptcy Court approved the Original DIP Agreement on an interim basis, and on October 31, 2017, after a final hearing, the Bankruptcy Court issued a final order (the "Original DIP Order") approving the Original DIP Agreement. *See* Original DIP Order, Oct. 31, 2017, KeyBank Compl., Ex. A (Dkt. 1-1); Fifth Third Compl., Ex. A (Dkt. 1-1). The terms of the Original DIP Agreement and Original DIP Order most relevant to these cases provide as follows:

(1) the Original Roll-Up Loans and Original New Money Loans are to be secured by liens of equal priority and are entitled to *pari passu* (i.e., equal) payment priority unless the Roll Up Lenders agree otherwise (the "*pari passu* treatment provision")[7];

(2) any modification of the Original DIP Order must not affect lien priority or payment priority of the DIP Loans, and any lien priming requires KeyBank and Fifth Third to Consent (the "priming lien prohibition");

(3) any disproportionate payment received by any lender must be shared *pro rata* with all of the other DIP Lenders (the "*pro rata* sharing requirement");

(4) any material amendment or modification to the Original DIP Order requires Plaintiffs' consent (the "material modification consent provision");

(5) any waivers, modifications, or amendments that would reduce the principal of any DIP Loan require the consent of each Lender entitled to such amount (the "principal payment reduction bar"); and

---

[6] For further background, under 11 U.S.C. § 364(c), a post-petition lender can be granted "superpriority" claims to repayment, in addition to liens that are senior to existing liens of pre-petition or other post-petition lenders (referred to as "priming liens"). *See* 7 Collier Bankruptcy Practice Guide ¶ 131.06. The debtor can only make such post-petition arrangements after it has first demonstrated that reasonable attempts to obtain unsecured credit under 11 U.S.C. § 364(a)-(b) were unavailing, and that pre-existing lienholders who are being primed will receive adequate protection, that is, protection from diminution in the value of the collateral during the reorganization. *Id.*

[7] Under the Original DIP Agreement, the Roll-Up Lenders agreed to subordinated payment priority under the following circumstances: (1) in the event of a default by Appvion and the exercise of remedies of a lender, the Original New Money Loans would be senior in payment priority to the Original Roll-Up loans; but this would not apply to any exit financing, *see* Original DIP Agreement, § 8.02(a); and (2) the Original New Money Loans would be senior with respect to proceeds from certain authorized prepayments, *see id.* at § 2.05(b)(iii). *See also* KeyBank Compl. ¶¶ 22–23, 27; Fifth Third Compl. ¶¶ 22–23, 28 (mentioning these "limited seniority exceptions").

(6) the release of all or substantially all of the collateral in any transaction or series of related transaction requires the written consent of each DIP Lender (the "collateral release prohibition").[8]

Plaintiffs argue that Defendants' subsequent conduct in the bankruptcy proceeding, as detailed below, breached each of these provisions of the Original DIP Agreement.

### B. The Stalking Horse Purchase and Sale Motion

At the end of 2017, Appvion defaulted on certain of its obligations under the Original DIP Agreement. Defendants and Appvion then negotiated a series of transactions in January 2018 to keep Appvion alive. Under these proposed transactions: (1) Defendants would direct the agent of the Original DIP Agreement to waive Appvion's defaults thereunder; (2) Defendants would guarantee to provide $15 million in additional new money loans; and (3) Defendants would direct the DIP agent to facilitate the formation of an entity to serve as a stalking horse bidder in an auction for substantially all of Appvion's assets—upon approval of the Bankruptcy Court. *See* 11 U.S.C. § 363. Under the proposed stalking horse bid, the $85 million of the Original New Money Loans would be assumed by the purchaser, while the holders of the $240 million in Original Roll-Up Loans, including Plaintiffs, would receive equity in the acquired company as part of a credit bid.[9] On February 8, 2018, Appvion filed the "sale motion" seeking the Bankruptcy Court's approval of the Stalking Horse Purchase Agreement.

Plaintiffs objected to the Sale Motion. Because the Original New Money Loans would be assumed by the Stalking Horse Purchaser, while the Original Roll-Up Loans would be subject to

---

[8] The Original DIP Agreement and Original DIP Order also granted the lenders certain indemnification rights against Appvion, which are not alleged in the Complaints, but are discussed at length in the parties' briefing and in Part II.D of this Opinion.

[9] A credit bit is when a creditor bids for property owned by its bankrupt debtor using the owed debt to offset the purchase price. *See RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 642 (2012); *see also* 11 U.S.C. § 363(k) ("At a sale . . . of property that is subject to a lien that secures an allowed claim, unless the court for cause orders otherwise the holder of such claim may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property.").

a credit bid, Plaintiffs argued that this effectively prioritized the Original New Money Loans over the Original Roll-Up Loans, in violation of several terms of the Original DIP Agreement. In response, Defendants withdrew their proposal and revised it in a supposed effort to accommodate Plaintiffs' objections over the disparate treatment of the Original Roll-Up and New Money loans.

### C. The Amended DIP Agreement & Revised Stalking Horse Procedures

Appvion and Defendants ultimately revised their proposed agreement so that the Stalking Horse Purchaser would no longer directly assume the $85 million in Original New Money loans. Instead, they would seek to amend the Original DIP Agreement so that the $85 million of Original New Money Loans would be rolled up into a new $100 million loan, with the extra $15 million constituting additional new money loans from Defendants. This new $100 million loan would serve as a new debtor-in-possession credit facility (the "New DIP Facility") with priority claims to, and liens on, the DIP Collateral senior to the existing claims and liens of the Original Roll-Up Loans. The Stalking Horse Purchaser would then assume the New DIP Facility, as opposed to any of the Original DIP Loans, while the Original Roll-Up Loans would be subject to a credit bid for equity in the Stalking Horse Purchaser. Thus, under these revisions, the Original Roll-Up Loans would become subordinate to the New DIP Facility, which would be made up in part of the Original New Money Loans.

On March 5, 2018, Appvion filed a revised Stalking Horse Purchase Agreement as well as a motion seeking approval of the Amended DIP Agreement that would incorporate the above amendments into the Original DIP Agreement. *See* Appvion Mot. to Approve DIP Financing (Bankr. Dkt. 520); Revised Asset Purchase Agreement (Bankr. Dkt. 530). After an interim hearing on March 12, 2018, and a final hearing on March 29, 2018, the Bankruptcy Court approved the proposed Amended DIP Agreement. Importantly, however, the Bankruptcy Court expressly stated

that its rulings did not affect any inter-lender rights that KeyBank or Fifth Third Bank may possess against other parties to the Original DIP Agreement. *See* March 12, 2018, Interim Hr'g Tr., Amended DIP Authorization, at 82:15–20, Shamah Decl. Ex. B (KeyBank Dkt. 26-2; Fifth Third Dkt. 25-2). Similarly, the Bankruptcy Court's Amended DIP Order provided that its findings were "without prejudice to the claims and causes of action asserted or that may be asserted" in this litigation, which had been filed in New York County Supreme Court earlier that day, "provided, however, that the plaintiffs in the litigations agree that no claim or cause of action . . . shall constitute a collateral attack on approval of the [New] DIP Facility . . . and the [Amended] DIP Order[.]" Amended DIP Order, Rider A, Shamah Decl., Ex. F (KeyBank Dkt. 26-6; Fifth Third Dkt. 25-6).

### D. This Action

As noted above, hours prior to the Bankruptcy Court's entry of the Amended DIP Order, KeyBank and Fifth Third Bank commenced two separate actions against Defendants in New York Supreme Court asserting claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and tortious interference of contract, all arising out of Defendants' decision to enter into the Amended DIP Agreement which Plaintiffs allege violated the Original DIP Agreement. Plaintiffs also sought a declaratory judgment that Defendants' conduct was prohibited by the Original DIP Agreement, that the Original Roll-Up Loans must be treated the same as the Original New Money Loans, and that Defendants must share any payments on the Original New Money Loans equally with Plaintiffs and other lenders.

On April 27, 2018, Defendants removed the state court actions to this Court pursuant to 28 U.S.C. §§ 1334, 1446, 1452 and Fed. R. Bankr. P. 9027. *See* Notice of Removal (KeyBank Dkt. 1; Fifth Third Dkt. 1). On May 14, 2018, Defendants filed a motion to transfer these cases

to the United States District Court for the District of Delaware so that they could then be referred to the Delaware Bankruptcy Court. *See* Amended Standing Order of Reference (D. Del. Feb. 29, 2012). On the same day, the Bankruptcy Court also entered an order approving and authorizing Appvion's motion to sell substantially all of its assets to AHC. *See* Gordon Decl. Ex. A (KeyBank Dkt. 31). On June 12, 2018, Plaintiffs responded to Defendants' motion to transfer by simultaneously opposing the motion and moving this Court to remand the actions back to the New York State Court. Defendants also filed an unopposed letter motion to consolidate these cases.

On August 14, 2018, the Bankruptcy Court entered the "Plan Confirmation Order" approving Appvion's liquidation plans, the effective date of which occurred on August 24, 2018, when a liquidating trust was created. *See* Bankr. Dkt. 970. The estate continues to be administered, however, and thus the Bankruptcy proceedings will remain ongoing until the Bankruptcy Court discharges the trustee and closes the case. *See* 11 U.S.C. § 350(a).

After this Court scheduled oral argument on the pending motions, Defendants filed a letter drawing the Court's attention to a recent decision in this district considering similar issues, to which Plaintiffs responded. *See* KeyBank Dkts. 39, 42; Fifth Third Dkts. 35, 37–38 (debating the relevance of *Argosy Capital Grp. III, L.P. v. Triangle Capital Corp.* to these cases, No. 17 Civ. 9845, 2019 WL 140730 (S.D.N.Y. Jan. 9, 2019) ("*Argosy*")).

The Court held oral argument on February 5, 2019, after which it authorized the parties to file letter briefs addressing any remaining issues.

# DISCUSSION

## I. Consolidation

As an initial matter, the Court grants Defendants' unopposed letter motion to consolidate these actions. Under Fed. R. Civ. P. 42(a), "[i]f actions before the court involve a common question of law or fact, the court may . . . consolidate the actions." Consolidation is intended to "avoid unnecessary costs or delay" thereby promoting judicial economy. *Johnson v. Celotex Corp.*, 899 F.2d 1281, 1284-85 (2d Cir. 1990). And "[s]o long as any confusion or prejudice does not outweigh efficiency concerns, consolidation will generally be appropriate." *Crowe v. JPMorgan Chase & Co.*, No. 09 Civ. 778, 2009 WL 3852381, at *3 (S.D.N.Y. Nov. 18, 2009).

Consolidation here is warranted. Both cases involve the same defendants and arise out of the same contractual dispute. The factual allegations, the legal claims and the relief sought are all identical, as are the legal issues. Except for the difference in Plaintiffs' names, Defendants have filed identical briefs in both actions. Plaintiffs have filed separate briefing, authored by different counsel, but nevertheless join in and adopt each other's memoranda in support of their motions. Altogether, this is a recipe for consolidation. *See City of New York v. Fedex Ground Package System, Inc.*, No. 13 Civ. 9173 (ER), 2016 WL 1532252, at *2 (S.D.N.Y. Apr. 15, 2016) (consolidating cases where they "concern the same plaintiffs, same defendant, and near-identical allegations" and "Plaintiffs seek the same form of relief for the same pattern of conduct on the part of the [defendant]"). Moreover, given the identical procedural posture of these two cases and the fact that consolidation is not contested, there is no risk of prejudice to the parties. *See id.* at *3 (finding no risk of prejudice where request to consolidate is unopposed). Defendants' motion to consolidate is therefore granted and the Court refers to these actions as a single case in addressing the remand and transfer motions.

## II. Plaintiffs' Motion to Remand

### A. Legal Standards

Defendants, as the parties seeking removal, bear the burden of establishing that this Court has subject matter jurisdiction over Plaintiffs' claims. *McNutt v. Gen. Motors Acceptance Corp.*, 298 U.S. 178, 189 (1936); *Linardos v. Fortuna*, 157 F.3d 945, 947 (2d Cir. 1998). "Out of respect for the limited jurisdiction of the federal courts and the rights of states, [courts] must resolv[e] any doubts against removability." *In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 488 F.3d 112, 124 (2d Cir. 2007). Relevant here, "[s]ubject matter jurisdiction is assessed as of the commencement of an action," or, in other words, at the time these cases were removed. *In re Urban Box Office Network, Inc.*, No. 01 Civ. 8854 LTS THK, 2003 WL 22971510, at *2 (S.D.N.Y. Dec. 18, 2003) (citing *Freeport-McMoRan, Inc. v. K N Energy, Inc.*, 498 U.S. 426, 428 (1991)).

Section 28 U.S.C. 1452(a) provides that "[a] party may remove any claim or cause of action in a civil action . . . to the district court for the district where such civil action is pending, if such district court has jurisdiction of such claim or cause of action under section 1334 of this title." Section 28 U.S.C. 1334 in turn vests district courts with jurisdiction over "all proceedings *arising under* title 11, or *arising in* or *related to* cases under title 11." *See generally Stern v. Marshall*, 564 U.S. 462 (2015) (emphasis added). These "three types of jurisdiction that district . . . courts may exercise under 1334 are colloquially referred to as 'arising under,' 'arising in,' and 'related to' jurisdiction." *Lothian Cassidy, LLC v. Lothian Exploration & Development II, L.P.*, 487 B.R. 158, 161 (S.D.N.Y. 2013). "Arising under" jurisdiction exists in "any matter under which a claim is made under a provision of title 11." *In re Salander—O'Reilly Galleries, LLC*, 475 B.R. 9, 27 (S.D.N.Y. 2012). "Arising in" jurisdiction exists in a matter where the claims "are not based on any right expressly created by title 11, but nevertheless would have no existence outside the

10

bankruptcy." *Baker v. Simpson*, 613 F.3d 346, 350-51 (2d Cir. 2010). Lastly, "related to" jurisdiction exists if the action's "outcome might have any conceivable effect on the bankrupt estate." *Parmalat Capital Fin. Ltd. v. Bank of Am. Corp.*, 639 F.3d 572, 579 (2d Cir. 2011). "In determining whether [federal] jurisdiction is proper, [the Court] look[s] only to the jurisdictional facts alleged in the Notice[] of Removal." *In re MTBE Prods. Liab. Litig.*, 488 F.3d at 124.

The specific basis for jurisdiction dictates whether this case is deemed a "core" or "non-core" bankruptcy proceeding. If the Court has *only* "related to" jurisdiction, then the case is a "non-core" proceeding, and the doctrine of mandatory abstention applies. *Baker*, 613 F.3d at 350. Pursuant to that doctrine, "the district court shall abstain from hearing such proceeding if an action . . . can be timely adjudicated, in a State forum of appropriate jurisdiction." 28 U.S.C. § 1334(c)(2). Where a case has been removed from state court and some parties, such as Plaintiffs here, have argued that the Court must abstain, the Court must do so if the following six criteria are met: (1) a "timely" motion for abstention is brought; (2) the action is based upon a state law claim; (3) the action is "related to" a bankruptcy proceeding, as opposed to "arising under" the Bankruptcy Code or "arising in" a case under the Bankruptcy Code; (4) the sole federal jurisdictional basis for the action is 28 U.S.C. § 1334; (5) the action was "commenced" in state court; and (6) the action is capable of being "timely adjudicated" in state court. *Trs. of Masonic Hall & Asylum Fund v. Pricewaterhousecoopers LLP*, No. 08 Civ. 10494(GEL), 2009 WL 290543, at *4 (S.D.N.Y. Feb. 6, 2009).

If the Court has either "arising under" or "arising in" jurisdiction, however, then it is a "core proceeding," *Baker*, 613 F.3d at 350, and the doctrine of permissive—not mandatory—abstention applies. *See* 28 U.S.C. § 1334(c) ("[N]othing in this section prevents a district court in the interest of justice, or in the interest of comity with State courts or respect for State law, from

11

abstaining from hearing a particular proceeding arising under title 11 or arising in or related to a case under title 11."). Against the bedrock principle that federal courts have a "virtually unflagging obligation . . . to exercise the jurisdiction given them," *Colo. River Water Conserv. Dist. v. United States*, 424 U.S. 800, 817 (1976), courts balance the following factors in deciding whether permissive abstention is warranted:

> (1) the effect or lack thereof on the efficient administration of the estate if a Court recommends abstention, (2) the extent to which state law issues predominate over bankruptcy issues, (3) the difficulty or unsettled nature of the applicable state law, (4) the presence of a related proceeding commenced in state court or other nonbankruptcy court, (5) the jurisdictional basis, if any, other than 28 U.S.C. § 1334, (6) the degree of relatedness or remoteness of the proceeding to the main bankruptcy case, (7) the substance rather than form of an asserted 'core' proceeding, (8) the feasibility of severing state law claims from core bankruptcy matters to allow judgments to be entered in state court with enforcement left to the bankruptcy court, (9) the burden on the court's docket, (10) the likelihood that the commencement of the proceeding in a bankruptcy court involves forum shopping by one of the parties, (11) the existence of a right to a jury trial, and (12) the presence in the proceeding of nondebtor parties.

*Lothian Cassidy*, 487 B.R. at 165 (citations omitted).

While Plaintiffs assert that this Court lacks both "arising under" and "arising in" jurisdiction, they request, in the alternative, that the Court remand the case for equitable reasons, pursuant to 28 U.S.C. § 1452(b), which provides that "[t]he court to which such claim or cause of action is removed may remand such claim or cause of action on any equitable ground." In assessing whether to remand a case under 28 U.S.C. § 1452(b), courts consider a similar set of factors as when deciding whether to permissively abstain, including: "(1) whether issues of state law predominate; (2) whether judicial economy would be served by . . . equitable remand; (3) whether § 1334(b) is the sole basis for exercising federal jurisdiction; (4) whether the proceeding involves non-debtors; (5) the degree of relatedness or remoteness of the proceeding to the main bankruptcy case; and (6) the likelihood that the proceeding was commenced in a particular forum

because of forum shopping on the part of one of the parties. " *Rahl v. Bande*, 316 B.R. 127, 135 (S.D.N.Y. 2004).

## B. "Arising Under" Jurisdiction

Defendants have not persuaded the Court that "arising under" jurisdiction exists in this case. Courts in this circuit have construed the existence of "arising under" jurisdiction to be dependent upon the plaintiffs' causes of action being asserted under a provision of Title 11 of the Bankruptcy Code. *See, e.g., Winstar Holdings, LLC v. Blackstone Group L.P.*, No. 07 Civ. 4634(GEL), 2007 WL 4323003 (S.D.N.Y. Dec. 10, 2007) (interpreting the phrase "arising under" in 28 U.S.C. § 1334(1) in the same manner that courts interpret the phrase in the federal question jurisdiction statute, 28 U.S.C. § 1331, namely, that "'the plaintiff's statement of his own cause of action [must] show[] that it is based upon' federal law," in this case, Title 11) (quoting *Louisville & Nashville R.R. Co. v. Mottley*, 211 U.S. 149, 152 (1908)).

Here, Plaintiffs assert state law breach of contract and related claims, which do not arise under Title 11. Defendants nevertheless argue that "arising under" jurisdiction exists because the Original DIP Agreement "is a product of Section 364 of the Bankruptcy Code," and Plaintiffs' claims are based in part on Defendants' alleged conduct in obtaining a priming lien without their consent, which involves concepts that "flow directly from the Bankruptcy Code." Defs' Mem. Opp. at 11 (KeyBank Dkt. 33; Fifth Third Dkt. 29). Such arguments better support a finding of "arising in" jurisdiction, as opposed to "arising under" jurisdiction, as discussed further below. Indeed, Defendants cite *Baker*, in support of those arguments, and quote that case for the proposition that "arising under" jurisdiction turns on "whether claims that appear to be based in state law are really an extension" of bankruptcy proceedings. As Plaintiffs correctly note,

however, the *Baker* Court was referring to "arising in" jurisdiction—*Baker* did not address the requirements for "arising under" jurisdiction. *See* 613 F.3d at 350.

Ultimately, the fact that the contract at issue in this case is a product of bankruptcy law and proceedings does not convert Plaintiffs' breach of contract and other state causes of action into a cause of action under Title 11. There is no "arising under" jurisdiction in this case.

### C. "Arising In" Jurisdiction

The Court agrees with Defendants, however, that this case "arises in" Title 11. Proceedings "arising in"—as with ones "arising under"—Title 11 correspond to the Court's core bankruptcy jurisdiction. Section 28 U.S.C. § 157(b)(1) provides that "[b]ankruptcy judges may hear and determine all cases under title 11 and all core proceedings arising under title 11, or arising in a case under title 11 . . . ." Although Plaintiffs portray this case as a simple contractual dispute, a proceeding over breach of contract claims can still "arise in" Title 11 and constitute a core bankruptcy proceeding. Such is the case, where, as here, the dispute concerns a post-petition contract the resolution of which depends upon the interpretation of bankruptcy court orders.

In assessing whether a contractual dispute "arises in" Title 11, courts often consider whether the dispute is a core proceeding by applying the following two factors set forth by the Second Circuit: "(1) whether the contract is antecedent to the reorganization petition; and (2) the degree to which the proceeding is independent of the reorganization." *In re U.S. Lines, Inc.*, 197 F.3d 631, 637 (2d Cir. 1999). The parties do not contest that the contract at issue here is a post-petition contract as it was executed with Appvion as debtor-in-possession, *i.e.*, after Appvion petitioned for bankruptcy. *See* Original DIP Order; 11 U.S.C. §§ 101, 1101. Further, for the reasons that follow, the Court concludes that this proceeding is not sufficiently independent of the reorganization to be deemed non-core.

14

Determining whether a proceeding is independent of the reorganization "hinges on the nature of the proceeding." *In re Petrie Retail, Inc.*, 304 F.3d 223, 229 (2d Cir. 2002). A proceeding may be deemed core, by its nature, "if either (1) the type of proceeding is unique to or uniquely affected by the bankruptcy proceedings . . . or (2) the proceedings directly affect a core bankruptcy function." *Id.*

Plaintiffs' claims are uniquely affected by a core bankruptcy function because they are based on rights that were established in an order to obtain credit and to use cash collateral—the result of a core bankruptcy proceeding. *See* 28 U.S.C. § 157(b)(2)(D), (M) ("Core proceedings include, but are not limited to . . . orders in respect to obtaining credit . . . orders approving the use or lease of property, including the use of cash collateral[.]"). Indeed, many of Plaintiffs' allegations were already presented to the Bankruptcy Court when it was deciding whether to issue the Amended DIP Order, which further supports the notion that the claims here are uniquely affected by a core bankruptcy function. *See In re Petrie Retail, Inc.*, 304 F.3d at 230 (dispute involving "an issue already before the bankruptcy court . . . uniquely affected and was uniquely affected by . . . core bankruptcy functions."). In particular, both Plaintiffs principally objected that the Amended DIP Agreement violated "numerous provisions of the [Original] DIP Order," namely the "*pari passu* treatment" and the "consent modification" provisions.[10] These same allegations provide the basis for Plaintiffs' breach of contract and tortious interference with contract claims

---

[10] *See* KeyBank Obj. to Entry of Amended DIP Order in *In re Appvion, Inc.*, Shamah Decl. Ex. D (Ex. A ¶¶ 11–13, 19, 26, 30) (KeyBank, Dkt. 26-5) (objecting to Appvion's motion for the Bankruptcy Court's approval of the Amended DIP Order because the Amended DIP Agreement allegedly modified "the priority scheme established pursuant to the [Original] DIP Order" without KeyBank's written consent); Fifth Third Obj. to Entry of Amended DIP Order in *In re Appvion*, Shamah Decl. Ex. E ¶ 4; Ex. E (Ex. A ¶¶ 1, 17–18) (Fifth Third, Dkt. 25-6) (objecting that Debtors were "seeking impermissibly to modify rights and protections" to Fifth Third "in direct contravention of the terms of [Original DIP] and of the Court approved DIP Credit Agreement" including by "accord[ing] different treatment to different DIP Lenders" absent Fifth Third's consent); *cf.* March 12, 2018 Interim Hr'g Tr., at 14:17–19 (Defendants contesting Plaintiffs' position that their interests in the DIP collateral were improperly subordinated by the Amended DIP Agreement and arguing that their interests were already subordinate under the Original DIP Agreement).

here.[11] Indeed, the Bankruptcy Court specifically recognized that Plaintiffs objected to the Amended DIP Order and contemplated that they might assert claims for "breach[] of the credit agreement [i.e., the Original DIP Agreement] . . . in an appropriate forum, whether it's this one or another one." *See* March 12, 2018 Interim Hr'g Tr. at 82:15-20; Amended DIP Order, Rider A.[12] Because the Bankruptcy Court's Original and Amended DIP Orders authorized the agreements at issue in this case, the present contractual dispute asserts rights that were established in connection with one of the Bankruptcy Court's core functions—here, the approval of Appvion's requests for more credit and the use of cash collateral. *See* 28 U.S.C. § 157(b)(2)(D), (N).

It is true, as Defendants argue, that pursuant to the survival provision in the DIP Orders, all obligations under those orders were extinguished when they were paid in full. *See* Original DIP Order ¶ 47; Amended DIP Order at 11; Joint Combined Disclosure Statement and Chapter 11 Plans of Liquidation, Section VII(A)(1)(c), Shamah Decl. Ex. H (KeyBank Dkt. 34-2; Fifth Third Dkt. 30-2). But Plaintiffs' claims are based on Defendants' conduct when the DIP Orders were in effect. Indeed, the Complaints assert that Plaintiffs obtained "numerous rights and protections" from the Original DIP Order, *see* KeyBank Compl. ¶ 25, Fifth Third Compl. ¶ 25, and that Defendants breached several provisions of the Original DIP Order itself.[13] And to the extent the alleged breaches were based on Defendants obtaining a priming lien without Plaintiffs' consent, Plaintiffs cite *only* the Original DIP Orders—not the Original DIP Agreement—as the basis for

---

[11] To sustain a claim for tortious interference of contract with respect to the Original DIP Agreement, under New York law, Plaintiffs need to prove, among other things, that Defendants intentionally procured an actual breach of the Original DIP Agreement. *See Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 424 (1996); Original DIP Agreement, § 11.14(a) (providing that New York law governs).

[12] The Bankruptcy Court declined to consider such claims at that time, however, because its principal concern was "whether the debtor ha[d] met its burden under [11 U.S.C. §] 364," the provision laying out what a debtor must prove in order to obtain post-petition financing. It was persuaded that Appvion had done so. *See* March 12, 2018 Interim Hr'g Tr.at 82:15–20.

[13] *See* KeyBank Compl. ¶¶ 30, 32, 66, 71–75, 77–83, 85–91, 93, 98; Fifth Third Compl. ¶¶ 31, 32, 67, 72–76, 78–84, 86–92, 94, 99.

that obligation. *See* KeyBank Compl. ¶¶ 29–30, 32; Fifth Third Compl. ¶¶ 30–32. Plaintiffs' claims are thus intertwined with core bankruptcy functions because their resolution requires interpreting aspects of the Bankruptcy Court's DIP Orders. *See Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 151 (2009) ("[A]s the Second Circuit recognized[]. . . the Bankruptcy Court plainly had jurisdiction to interpret and enforce its own prior orders"); *Lothian Cassidy*, 487 B.R. at 162 ("'Arising in' claims may include matters involving the enforcement or construction of a bankruptcy court order.").

Moreover, deciding whether Defendants breached the terms of the Original DIP Agreement and DIP Order requires a court to consider to what extent the enforceability of that agreement and order were impacted by the subsequent Amended DIP Agreement and Order. The Original DIP Order, for example, provided that "in the event any or all of the provisions of this Final Order are hereafter modified . . . [an]y such modification, amendment or vacatur shall not affect . . . any lien, claim or priority authorized or created hereby." Original DIP Order ¶ 29(a). Because the Amended DIP Agreement nevertheless provided that the New DIP Facility would be "immediately senior in priority to the Existing DIP Liens," Plaintiffs allege that this priming provision violated ¶ 29(a) of the Original DIP Order. *See* KeyBank Compl. ¶¶ 29, 54, 56; Fifth Third Compl. ¶¶ 30, 55, 57. The Amended DIP Order, however, also provided that in the event there were any inconsistencies between its terms and the terms of the Original DIP Order, the Amended Final DIP Order would control. *See* Amended DIP Order ¶ 10. Accordingly, ascertaining whether Plaintiffs can succeed on their claims based on a violation of this "priming lien prohibition" in the Original DIP Order requires a court to consider whether this provision is enforceable to the extent it is inconsistent with the terms of the Amended DIP Order. The same goes for Defendants' purported violations of Plaintiffs' consent rights to material modifications of the Original DIP Order, and Plaintiffs'

request for a declaration that "[t]he terms and provisions of the [Original] DIP Agreement are binding and govern here." KeyBank Compl. ¶ 99; Fifth Third Compl. ¶ 100. Resolving these claims requires a court to interpret the DIP Orders, which were issued in the exercise of core bankruptcy functions, and thus further confer "core" jurisdiction over this case. *Lothian Cassidy*, 487 B.R. at 162 ("[A] bankruptcy court retains jurisdiction to interpret and enforce its own orders."); *In re Motors Liquidation Co.*, 513 B.R. 467, 477 nn. 42–43 (Bankr. S.D.N.Y. 2014) (citing cases).

In assessing "arising in" jurisdiction, courts have also applied the "but-for" test endorsed by the Second Circuit in *Baker* which is satisfied here. The *Baker* test provides that "arising in" jurisdiction encompasses claims that "are not based on any right expressly created by title 11, but nevertheless, would have no existence outside of the bankruptcy." 613 F.3d at 350–51. The conduct at issue in this case is Defendants' decision to agree to provide Appvion with further post-petition financing under the terms of the Amended DIP Agreement, which was approved by the Bankruptcy Court's Amended DIP Order. That conduct was born out of bankruptcy law and bankruptcy proceedings, because, absent the Bankruptcy Code, there would be no DIP Agreement, no Amended DIP Agreement, and no DIP Orders. *See Delaware Trust Co. v. Wilmington Trust, N.A.*, 534 B.R. 500, 514 (S.D.N.Y 2015) (holding that inter-creditor dispute over how adequate protection payments were supposed to be calculated under an inter-creditor agreement could only have arisen in a bankruptcy proceeding because bankruptcy law governs the use of such payments). Each of Plaintiffs' claims, then, "arise in" title 11, under the "but-for" test because, by their nature, they could only arise out of the bankruptcy proceedings.[14]

---

[14] Plaintiffs' reliance on *Winstar Holdings, LLC* does not support their position that this Court lacks "arising in" jurisdiction. The *Winstar* Court cautioned that "[t]he mere fact that the cause of action would never have arisen absent this particular bankruptcy is not enough to confer jurisdiction." 2007 WL 4323003, at *4. The Court nevertheless held that "the claims at issue," which were misrepresentation claims "sound[ing] solely in New York

The Court is not persuaded by Plaintiffs' argument that finding this proceeding to be "core" would mean "that the existence of the post[-]petition DIP Credit agreement is the bellwether for jurisdiction." *See* Fifth Third Reply Mem. at 4 (Fifth Third Dkt. 31). The post-petition nature of the DIP Agreements does not provide a standalone basis to confer "arising in" jurisdiction here— rather, it is that Plaintiffs' claims assert rights that were established in the Bankruptcy Court's DIP Orders, in addition to the DIP Agreements, and that those claims specifically turn on issues that require interpreting the provisions of those agreements and orders.

Nor is the Court persuaded by Plaintiffs' contention that the decisions of bankruptcy courts in this district such as *In re GSC, Inc.*, 453 B.R. 132 (Bankr. S.D.N.Y. 2011), and *In re Metaldyne Corp.*, 409 B.R. 671 (Bankr. S.D.N.Y. 2009), mandate that this case be remanded. Those cases are distinguishable in important respects. First, the contracts at issue in both of those cases were *pre-petition* credit agreements that did not depend upon the entry of bankruptcy court orders to become enforceable, and the plaintiffs were not asserting that the defendants breached obligations under any bankruptcy court orders. In addition, neither opinion concerned a dispute over whether a federal court would have subject matter jurisdiction over the claims arising from those credit agreements. Rather, before both bankruptcy courts were objections of pre-petition lenders to pending decisions on whether to approve certain credit bids of the debtors' assets. To the extent the pre-petition creditors were arguing over how proceeds from the sale of the debtors' assets would be distributed amongst themselves, the *In re Metaldyne Corp.* court held that such a dispute was not properly before it "if [it] ever could properly be brought before th[e] [c]ourt." 409 B.R. at 679. The *In re GSC, Inc.* court declined to rule on the allocation issue because the plaintiffs had

---

New York common law," were "more closely connected to the administration of the bankruptcy than most garden-variety common-law claims." *Id.* Similarly here, this post-petition breach of contract action is sufficiently removed from the ordinary common law breach of contract action, because, as previously explained, resolving it requires interpreting aspects of bankruptcy court orders that were entered in the exercise of a bankruptcy court's core functions.

reserved claims against the defendant creditor and administrative agent in state court. 453 B.R. at 171–72.

By contrast, Plaintiffs' claims do not dispute how to allocate proceeds from a sale of a debtor's assets among creditors. Rather, they concern whether and to what extent Defendants are liable for alleged harms caused to the Plaintiff-creditors based on rights established in bankruptcy court orders that were entered in a core bankruptcy proceeding. Accordingly, this case "arises in" Title 11, is a core proceeding, and Plaintiffs' demand for mandatory abstention is moot. *See* 28 U.S.C. § 1334(c)(2).

### D. "Related to" Jurisdiction

Having found that "arising in" jurisdiction exists, and that the doctrine of permissive—not mandatory—abstention thus applies, a ruling on Plaintiffs' motion to remand could end here. *See, e.g., Winstar Holdings, LLC,* 2007 WL 4323003, at *5 (denying motion to remand after finding "arising in" jurisdiction existed, without assessing whether the court also had "related to" jurisdiction). Plaintiffs, however, cite the Third Circuit's opinion in *In re Marcus Hook Dev. Park, Inc.,* for the proposition that "arising in" jurisdiction cannot exist, or that a dispute cannot be deemed core, unless "related to" jurisdiction is also present. 943 F.2d 261 (3d Cir. 1991). In response, Defendants argue that *In re Motors Liquidation Co.,* 514 B.R. 377 (Bankr. S.D.N.Y. 2014), and numerous bankruptcy court decisions have held that a bankruptcy court has jurisdiction to interpret its prior orders under those courts' "arising in" jurisdiction, regardless of whether "related to" jurisdiction also exists. *See id.* at 380 & nn. 4–8. The Court need not weigh in on this debate, however, because for the reasons that follow, "related to" jurisdiction is also present in this case.

The Court analyzes whether it has "related to" jurisdiction based on the facts existing at the time the case was removed. *See Fried v. Lehman Bros. Real Estate Assocs. III, L.P.*, 496 B.R. 706, 710 (S.D.N.Y. 2013) ("Federal jurisdiction arising under section 1334 of the Bankruptcy Code is decided, like federal jurisdiction generally, on the basis of the facts at the time of removal."). Indeed, as this Court has noted "adopting a rule that would divest federal courts of subject matter jurisdiction over actions 'related to' a bankruptcy estate as the confirmation of the reorganization plan grew near would create perverse incentives for the parties to engage in delay and gamesmanship in both the bankruptcy reorganization and the related litigation." *In re WorldCom, Inc. Sec. Litig.*, 294 B.R. 553, 557 (S.D.N.Y. 2003).

As previously noted, "related to" jurisdiction exists if the action's "outcome might have any conceivable effect on the bankrupt estate," *Parmalat Capital Fin. Ltd.*, 639 F.3d at 579, including by giving rise to an indemnification against the debtor, *Celotex Corp. v. Edwards*, 514 U.S. 300, 307-308 (1995). The Second Circuit recently reiterated that an indemnification claim against a debtor that would impact the distribution of estate property "need not be certain to provide a federal court with [related to] jurisdiction." *SPV Osus Ltd. v. UBS AG*, 882 F.3d 333, 340 (2d Cir. 2018). To "determin[e] whether potential claims by third party defendants against the debtor for . . . indemnification . . . give rise to related to jurisdiction over litigation to which the debtor is not a party, courts in this circuit . . . have generally found jurisdiction where there is a 'reasonable' legal basis for the claim." *Id.*

"Related to" jurisdiction exists here because, at the time of removal, Defendants had a reasonable legal basis to assert an indemnity claim against Appvion based on the current

litigation.[15] The indemnification provision in the Original DIP Agreement provides that the "Loan Parties," which are defined in the Original DIP Order as Appvion and its Guarantors, shall:

> jointly and severally indemnify . . . each Lender . . . and each Related Party of any of the foregoing Persons (each such Person being called an "Indemnitee") against . . . **any and all losses, claims, damages, liabilities, costs and related expenses . . . for all Indemnitees . . . incurred by any Indemnitee or asserted against any Indemnitee by any third party or by the Borrower or any other Loan Party** arising out of, in connection with, or as a result of . . . the execution or delivery of this [DIP] Agreement . . . the performance by the parties hereto of their respective obligations hereunder or thereunder . . . . or . . . any actual or prospective claim, litigation . . . or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by any Group Member [defined as a collective reference to Appvion and related entities] . . . . **provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses . . .** are [1] determined by a court of competent jurisdiction . . . to have resulted from the gross negligence or willful misconduct of such Indemnitee or its Related Parties or . . . [2] **is solely amongst Indemnitees and/or their Related Parties and does not involve an act or omission by any Group Member** . . . .

Original DIP Agreement, § 11.04(b), Shamah Decl. Ex. C (KeyBank Dkt. 26-3; Fifth Third Dkt. 25-3) (emphasis and alterations added)).

Plaintiffs argue that any potential indemnification claims against Appvion stemming from this case could not have fit within the scope of this indemnification provision. The Court disagrees. The provision may encompass any claims "incurred by any Indemnitee," *including from another indemnitee,* "*or* asserted against any Indemnitee by any third party or the Borrower or any other Loan Party." (emphasis added).[16] This reading is supported by the Original DIP Order which provides that Appvion "shall indemnify and hold harmless the DIP Secured Parties,"—which include Plaintiffs and Defendants (*see* Original DIP Order at 2)—"against all losses, liabilities, claims, damages or other expenses arising out of or relating to the [Original DIP Agreement] and [Appvion's] use of the financing provided thereunder." Original DIP Order ¶ 16(b).

---

[15] The parties do not dispute that the Bankruptcy Court's confirmation plan entered on August 24, 2018 released any of the parties' possible indemnification claims against Appvion under the Original DIP Agreement.

[16] The parties do not dispute that they are "indemnitees" under the Original DIP Agreement.

Nor, contrary to Plaintiffs' contentions, do Plaintiffs' claims fall within the two "carve-outs" in the indemnity provision for (1) claims resulting from "gross negligence or willful misconduct" on the part of an indemnitee, or (2) claims amongst indemnitees that do not involve "an act or omission by Appvion." Plaintiffs' claims for breach of contract, breach of the covenant of good faith and fair dealing, tortious interference with contract, and a declaratory judgment do not include allegations of gross negligence or willful misconduct. *See Hadami, S.A. v. Xerox Corp.*, 272 F. Supp. 3d 587, 601 (S.D.N.Y. 2017) ("claims based on negligent or grossly negligent performance of a contract are not cognizable" under New York law); *see also Brooklyn 13th Street Holding Corp. v. Nextel of New York, Inc.*, No. 11-CV-1048 (CBA)(RLM), 2011 WL 6945862, at *5 (E.D.N.Y. Dec. 30, 2011) (recognizing under New York law that "[a]n intentional breach of contract, without more, cannot constitute 'willful' misconduct"). And the claims *do* involve acts by Appvion, because they are based on Defendants' conduct in entering into the Amended DIP Agreement with Appvion, which allegedly breached the terms of the Original DIP Agreement between Plaintiffs, Defendants, and Appvion. Had Appvion not entered into either of the DIP Agreements, Plaintiffs' current breach of contract claim would not exist.[17]

Accordingly, Appvion may have been obligated to indemnify the parties for costs arising out of this litigation; at the very least, Defendants have established that there was a reasonable legal basis to pursue an indemnification claim under the Original DIP Agreement and Original DIP Order. This suffices for the Court to find that "related to" jurisdiction exists. *SPV Osus Ltd.*, 882 F.3d at 342; *Parmalat Capital Fin. Ltd.*, 639 F.3d at 579.

---

[17] Appvion previously recognized that Defendants may seek indemnification from it in connection with these cases under Section 11.04(b) of the Original DIP Agreement. *See* Ltr. of Appvion Counsel to Defense Counsel, Notice of Removal, Ex. H (Dkt. 1-8)) (noting that "[u]nder section 11.04 . . . of [the Original DIP Agreement] . . . the Debtors may have obligations to indemnify Franklin, KeyBank, and Fifth Third against certain losses, claims, damages, liabilities and related expenses . . . that may be triggered by the Litigation").

### E. Permissive Abstention and Equitable Remand

The Court now turns to Plaintiffs' request for permissive abstention under 28 U.S.C. § 1334(c)(1) and Plaintiffs' alternative request for an equitable remand under 28 U.S.C. § 1452(B). As the permissive abstention and equitable remand factors overlap significantly, the Court analyzes them together. *In re WorldCom, Inc. Sec. Litig.*, 293 B.R. 308, 334 (S.D.N.Y. 2003) ("The equitable remand analysis . . . is essentially the same as the Section 1334(c)(1) abstention analysis.").

Plaintiffs have failed to satisfy their burden to establish that either permissive abstention or an equitable remand is appropriate here. *See CAMOFI Master LDC v. U.S. Coal Corp.*, 527 B.R. 138, 143 (Bankr. S.D.N.Y. 2015) (noting that party seeking remand bears the burden to establish that equitable remand is warranted); *In re Residential Capital, LLC*, 515 B.R. 52, 67 (Bankr. S.D.N.Y. 2014) (same as to permissive abstention). Principles of comity are not offended by declining to remand or abstain from this action; indeed, the state law claims are not novel or complex, which "significantly undercuts the degree to which the state law factor weighs in favor of remand to [the] New York courts." *Renaissance Cosmetics, Inc. v. Dev. Specialists Inc.*, 277 B.R. 5, 17 (S.D.N.Y. 2002). Nor are they as easily severable from the bankruptcy proceedings as Plaintiffs suggest, because they involve issues that require interpreting the Bankruptcy Court's orders. *See Lothian Cassidy, LLC*, 487 B.R. at 165 (placing less significance on state law nature of claims where the bankruptcy court had issued prior rulings "touch[ing] upon Plaintiffs' current allegations"). In other words, the fact that this proceeding "arises in" the bankruptcy proceedings strongly counsels against abstention and remand. *See Winstar Holdings, LLC*, 2007 WL 4323003, at *6 & n.3. The state court has also "invested little or no time" in this case as Defendants removed

the underlying actions shortly after they were filed. *Krys v. Sugrue*, No. 08 Civ. 3065(GEL), 2008 WL 4700920, at *10 (S.D.N.Y. Oct. 23, 2008); *Winstar Holdings, LLC*, 2007 WL 4323003, at *5.

On the other hand, there is little doubt, as Defendants acknowledged at oral argument, that the outcome of this proceeding will not impact what remains of the bankruptcy proceedings. Whether or not Defendants are liable to Plaintiffs for the alleged breaches of the Original DIP Agreement and DIP Order will not affect the distribution of property of the estate as the parties' claims against it have been satisfied in full. *See* Feb. 5, 2019 Hr'g Tr. 42:3–9. This factor thus weighs in favor of abstention and remand. *See, e.g., Allstate Ins. Co. v. CitiMortgage, Inc.*, No. 11 Civ. 1927(RJS), 2012 WL 967582, at *5-6 (S.D.N.Y. Mar. 13, 2012) (permissively abstaining from suit between non-debtors where the impact on estate administration was minimal in light of a prior liquidation of indemnification claims against the estate). That this dispute does not involve the debtor, and that a jury trial does not exist in the Bankruptcy Court, are facts that also cut in favor of abstention or remand. Nonetheless, the parties waived their right to a jury trial in Section 11.05 of the DIP Agreements. And while this case may no longer impact the administration of the estate, in light of the relevance of the Bankruptcy Court's DIP Orders to this dispute, in addition to the fact that federal courts have a "virtually unflagging obligation . . . to exercise the jurisdiction given them," *Colo. River Water Conservation Dist.*, 424 U.S at 817, the Court finds, on balance, that abstention and remand are not appropriate.

### III. Defendants' Motion to Transfer

Because this case constitutes a "core" bankruptcy proceeding, 28 U.S.C. § 1412 governs whether a transfer of venue is warranted. *See* 28 U.S.C. § 1412 ("A district court may transfer a case or proceeding under title 11 to a district court for another district, in the interest of justice or for the convenience of the parties."). Defendants bear the burden to show that this case should be

transferred by a preponderance of the evidence. *See In re Manville Forest Prods. Corp.*, 896 F.2d 1384, 1390–91 (2d Cir. 1990). Here, they have failed to meet it.

To determine whether a case should be transferred under 28 U.S.C. § 1412, courts first consider "whether the action could have been brought in the transferee district," and if so, "whether transfer would be an appropriate exercise of the Court's discretion." *Capital Mgmt., L.L.C. v. U.S. Bank Nat'l Ass'n,* No. 14 Civ. 8513(PAE), 2015 WL 1611391, at *3 (S.D.N.Y. Apr. 10, 2015). This case could have been brought in the United States District Court for the District of Delaware as that Court has federal subject matter jurisdiction to hear this case for the same reasons that this Court does, and it is not disputed that venue there would have been proper. For that same reason, the Delaware Bankruptcy Court—which the case would be referred to if transferred to the Delaware District Court pursuant to that Court's Standing Order—also has jurisdiction because that is where Appvion's bankruptcy is pending. *See* 28 U.S.C. § 1409(a) ("[A] proceeding arising under title 11 or arising in or related to a case under title 11 may be commenced in the district court in which such case is pending.").

In assessing whether transfer would be an appropriate exercise of the Court's discretion, courts in this circuit consider the following factors:

> (1) the plaintiff's choice of forum, (2) the convenience to witnesses, (3) the location of relevant documents and ease of access to sources of proof, (4) the convenience of parties to the suit, (5) the locus of operative facts, (6) the availability of process to compel the attendance of unwilling witnesses, (7) the relative means of the parties, (8) the forum's familiarity with the governing law, (9) trial efficiency, and (10) the interest of justice, based on the totality of the circumstances.

*Ritchie Capital Mgmt., L.L.C. v. BMO Harris Bank, N.A.,* No. 14 CIV. 1936 ER, 2015 WL 1433320, at *7 (S.D.N.Y. Mar. 30, 2015). The parties focus primarily on Plaintiffs' choice of forum, trial efficiency, and the interests of justice, specifically the public interest in centralizing bankruptcy proceedings.

Although efficiency would indeed be gained by transferring this case to Delaware, it would not be an appropriate exercise of this Court's discretion in light of the parties' agreement—in the bankruptcy proceedings—that this case be resolved in either New York state or federal court. In particular, in Section 11.14(b) of the Original DIP Agreement the parties agreed as follows:

> <u>SUBMISSION TO JURISDICTION</u>. THE BORROWER AND EACH OTHER LOAN PARTY IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE EXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURT OR, IF THE BANKRUPTCY COURT DOES NOT HAVE OR ABSTAINS FROM JURISDICTION, THE COURTS OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY AND OF THE UNITED STATES DISTRICT COURT OF THE SOUTHERN DISTRICT OF NEW YORK, AND ANY APPELLATE COURT FROM ANY THEREOF, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, AND **EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING SHALL BE HEARD AND DETERMINED IN SUCH NEW YORK STATE COURT OR, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN SUCH FEDERAL COURT.**

At oral argument Defendants asserted, for the first time, that this forum selection clause does not apply to inter-indemnitee disputes such as this one. *See* Feb. 5, 2019 Hr'g Tr. at 39:18–40:18; *see also* Defs' Feb. 7, 2019 Ltr. (KeyBank Dkt. 44; Fifth Third Dkt. 39). Specifically, Defendants argue that the phrase "any such action" encompasses only those actions between "the borrower and each other loan party." The Court is not persuaded. The phrase "any such action" refers to the preceding phrase, "any action or proceeding arising out of or relating to this agreement," and is not limited to those only between "the borrower and each other loan party." The final clause makes clear that "*each of the parties*" to the DIP Agreement—which includes Plaintiffs and Defendants, and not simply "the borrower and each other loan party"—agrees that disputes arising out of the DIP Agreement must be litigated in New York state or federal court.

Accordingly, this case is governed by a mandatory forum selection clause which is "presumptively entitled to substantial deference." *Gross v. British Broad Corp.*, 386 F.3d 224, 230 (2d Cir. 2004).

Defendants nonetheless urge the Court to disregard whatever meaning it ascribes to the forum selection clause because the "policy toward enforcement of forum-selection clauses is 'not so strong' as to mandate enforcement in the face of . . . countervailing public interests in centralizing bankruptcy proceedings, judicial economy, and overall justice." *Argosy*, 2019 WL 140730, at *7; *Delaware Trust Co.*, 534 B.R. at 521 (holding that, while forum selection clause under which parties consented to jurisdiction in the New York courts weighed against transfer to Delaware bankruptcy court, it did not "carry the day, as actions have frequently been transferred to jurisdictions where bankruptcy proceedings have been pending notwithstanding permissive forum clauses"). Here, however, the "countervailing public interests in centralizing bankruptcy proceedings" are not as compelling as they were in *Delaware Trust* or *Argosy*, upon which Defendants principally rely. Resolution of the dispute in *Delaware Trust* was deemed to potentially "affect the rights and prioritization among creditors" to the property of the bankruptcy estate, 534 B.R. at 521. Similarly, in *Argosy*, the Court found that the parties still had potential indemnification claims against the debtor that could impact future administration of the estate, 2019 WL 140730, at *7. Thus, in those cases, the public interest in having the bankruptcy proceedings centralized—so that the assets of the estates could be administered without undue interference stemming from the outcome of litigation in other forums—outweighed the fact that the plaintiffs had chosen their forum outside of the bankruptcy proceedings. *See also Credit Suisse AG v. Appaloosa Inv. Ltd.*, No. 15–cv–3474 (SAS), 2015 WL 5257003, at *11 (S.D.N.Y. Sept. 9, 2015) (concluding that enforcing a mandatory forum selection clause in an inter-creditor agreement "would not serve the interests of justice" because plaintiff was seeking to enforce rights

that could "jeopardize the legitimacy of the Debtors' reorganization" in contrast to cases that do not "interfere[] with the bankruptcy process").

By contrast, the parties here do not dispute that resolution of this case will not impact the distribution of assets remaining in the debtor's estate. Moreover, not only is the governing forum selection clause mandatory, but the parties agreed to be bound by it *in the bankruptcy proceedings*. The forum selection clauses in *Delaware Trust* and *Argosy*, on the other hand, were permissive, and were created in *pre-petition* contracts. The public interest in centralizing this dispute with the ongoing bankruptcy proceedings is thus relatively weak, while the countervailing interest in enforcing the parties' choice of forum is strong, given that the parties agreed that the New York courts would be the only forums to hear this case.

Judicial economy and the overall interests of justice are the remaining avenues with which this Court could consider overriding the parties' forum selection clause, but they provide an insufficient basis for doing so. Although the Delaware Bankruptcy Court is already familiar with the legal issues in this case, and although adjudicating this case requires interpreting that court's prior orders, this Court is confident that the bankruptcy courts in this district are equally capable of efficiently resolving this dispute. Tellingly, Defendants have not cited any authority, and the Court has found none, in which a mandatory forum selection clause entered into as part of a *post-petition* agreement was overridden in the interests of justice.

Thus, even though the Court has found that "arising in" jurisdiction exists in this case, which would strongly suggest that the Bankruptcy Court from which it arose is the preferred forum, *Winstar Holdings LLC*, 2007 WL 4323003, at *6, in light of the forum selection clause, the Court cannot conclude that such a countervailing interest outweighs the interest in enforcing the parties'

agreement to have this dispute heard in the New York. Defendants' motion to transfer is therefore denied.

## CONCLUSION

For the foregoing reasons, Defendants' motion to consolidate these cases is GRANTED, Plaintiffs' motion to remand the cases to New York State Court is DENIED, and Defendants' motion to transfer venue to the United States District Court for the District of Delaware is DENIED. The Clerk of Court is respectfully directed to terminate the motions pending at Dkts. 23, 24, 28, in Case No. 18-CV-3755, and Dkts. 22, 23, 26, in Case No. 18-CV-3762, and to refer this case to a bankruptcy judge for this district, pursuant to the Standing Order of Reference Re: Title 11 (S.D.N.Y. Jan. 31, 2012).

SO ORDERED.

Dated:    March 26, 2019
          New York, New York

Ronnie Abrams
United States District Judge